Ralph Alfred JOHNSON, Respondent,

v.

PAR–Z CONTRACTING, INC., et al., Relators,

Metro Sewer and Water Company, et al., Respondents,

United Benefit Life Insurance Company, intervenor, Respondent,

Blue Cross and Blue Shield of Minnesota, intervenor, Respondent,

Ramsey County Hospital and Sanitarium Commission, intervenor, Respondent.

No. 48129.

Supreme Court of Minnesota.

May 26, 1978.

Cousineau, McGuire, Shaughnessy & Anderson, Minneapolis, for relators.

Liefschultz & Dunn, St. Paul, for Johnson.

Jardine, Logan & O'Brien and Alan R. Vanasek and Richard T. Dolezal, St. Paul, for Metro Sewer and Water.

Cragg & Bailly, Minneapolis, for U. B. Ins.

Indru Advani, St. Paul, for Blue Cross.

Wm. B. Randall, County Atty., St. Paul, for Ramsey Co. Hosp., etc.

PER CURIAM.

Par-Z Contracting, Inc., and its compensation insurer seek review of a decision of the Workers' Compensation Court of Appeals determining that employee, who has been totally disabled since he suffered the rupture of a cerebral artery on November 9, 1974, is entitled to compensation because the rupture was the result of a head injury he sustained in the course of his employment on Tuesday, November 5, 1974. The court of appeals also found that no employment relationship existed between employee and respondent Metro Sewer and Water Company on the date of the injury. Relators contend that their proof shows conclusively that employee did not sustain a work-related injury; alternatively, they contend that the injury did not cause the rupture of his aneurysm. They also urge that Metro was a joint employer as a matter of law. We affirm the challenged findings and decision of the court of appeals.

Employee was a skilled operator of heavy equipment who worked for Metro for several years. In October 1974, Metro's work was slack and it faced the prospect of laying off several employees. At the request of Alfred Klous, Par-Z's president, Metro's manager, Leland Scheller, agreed orally to rent Par-Z a bulldozer which would otherwise be idle. Scheller refused to furnish an operator as a part of the rental agreement, but offered to send one if Par-Z would put him on its payroll. Klous agreed, and employee began work at Par-Z's construction site, operating the dozer to backfill trenches after installation of sewer and water mains by other employees.

The exhaust pipe on the bulldozer rented by Par-Z from Metro is in front of its cab, and employee found that diesel fumes would blow in his face. On Tuesday, November 5, in an effort to avoid the fumes, employee placed a longer piece of stovepipe over the exhaust pipe, a maneuver which required him to stand up in his cab and stretch forward. He testified that as he was about to sit down after doing this his

foot slipped and he fell backward. He said that he struck the right side of his head on an angle iron or "45 brace" between the front horizontal bar and the side vertical bar in the right front corner of the cab's roller bar system. He said it was a hard bump and he soon developed a swelling the size of "a goose egg cut in half" in the area of the bump. He did not tell other employees of the incident but told his wife and daughter of it, and they testified to observing the bump that evening. He also testified that he told his foreman and showed him the bump the next day; the foreman had no recollection of that occurrence.

Employee testified that he developed a rather severe headache soon after the incident and that this ache continued during the next 4 days. He said he also felt slightly nauseous and a little dizzy and that light seemed to bother him after receiving the bump. His wife testified that employee was unusually irritable during the week and did not carry on his usual activities in the evenings. Except for going home early on Thursday, however, he worked the rest of the week. He went out for dinner Friday night but did not feel well, returned home early, and slept poorly. Saturday morning he went on an errand and while on a freeway suffered an excruciatingly severe headache, losing consciousness shortly after he had stopped and telephoned a friend about his condition. Employee was then taken to Hennepin County General Hospital where an angiogram was performed, a rupture of an aneurysm in his right middle cerebral artery was diagnosed, and emergency surgery was performed.

1. Relators contend here, as they did below, that the finding employee injured his head in the course of employment cannot stand because photographic evidence of the bulldozer, some with another employee sitting and standing in it, demonstrates that it would have been physically impossible for employee to hit his head if he slipped and fell backward as he was sitting down. We agree with the court of appeals that these exhibits do not preclude the inference that employee struck his head while still standing and just after he had slipped

and started to fall backward. The inference can be reasonably drawn from employee's attempts to describe exactly how the accident occurred. The finding that he sustained the head injury also has substantial support in employee's testimony, that of his wife and daughter, and in the testimony of Dr. Gaylan Rockswold, the neurosurgeon who performed the surgery at General Hospital. Dr. Rockswold said that while employee was still in a comatose state at the hospital his wife mentioned that employee had bumped his head.

The further determination that the bump "resulted in a ruptured aneurysm on November 9, 1974" also has substantial evidentiary support in the opinion of Dr. Rockswold that the bump contributed substantially to the rupture. Based on his experience and on medical literature, he said that it is quite common to have prodromal or warning leaks of an aneurysm which will produce a variable amount of symptoms often not so severe that the person suffering them will then seek medical attention. The doctor said also that the bump employee received was a mild injury and not one which would be expected to result in persistent headaches for several days. He viewed some of employee's symptoms as nonspecific, but said that photophobia is a symptom of subarachnoid hemorrhage and that in his judgment the explanation for the headaches was that the aneurysm leaked after employee sustained the bump. On surgery, the doctor found a clot in the dome of the aneurysm and said that, although the age of the clot could not be determined, it was his opinion that it was very possible that the aneurysm had leaked and some days later resulted in the rupture employee suffered on Saturday.

Relators' witness Dr. Brian Krasnow, a neurologist, expressed the contrary opinion that there was no relationship between the bump and the rupture of the aneurysm. In his opinion, the aneurysm had not leaked before Saturday. He said that if it had ruptured "even minutely" before that time employee would have had an excruciatingly severe headache and most likely could not have driven to and from work nor operated

the bulldozer. Another medical expert testifying for relators was Dr. Robert E. Maxwell, a neurosurgeon. Dr. Maxwell thought it highly unlikely that there was a causal relationship between the bump and the rupture of employee's aneurysm, basing this opinion on the facts that in most such ruptures there is no specific causally related trauma and that employee's aneurysm was surrounded by brain tissue and subarachnoid tissue and thus quite well cushioned. Dr. Maxwell agreed, however, that employee's bump had been a mild head injury and that it was not typical or usual for a severe persistent headache to develop and last 4 days as a consequence of such an injury. He also said that if employee had suffered photophobia and slight dizziness after the bump occurred these symptoms would suggest that the bump had been of sufficient severity to result in a minor bleeding from the aneurysm. He agreed with Dr. Rockswold that small leaks from an aneurysm may cause symptoms which would not be so acute that the person suffering them would seek medical attention.

 It is plain from the foregoing summary that the court of appeals in resolving the conflicting medical opinions on causal relation chose the opinion of Dr. Rockswold. Relators contend that this opinion did not have support in the evidence because, in response to a hypothetical question they asked on cross-examination, the doctor agreed that the existence of a causal relation between the bump and the rupture of the aneurysm would be unlikely. Although they label the hypothetical question they asked the witness as "most accurate," the question in response to which Dr. Rockswold gave the opinion on which the finding of causal relation was based incorporated evidence in the record—the testimony of employee and his wife and daughter, as well as the testimony of a paramedic and a resident neurosurgeon at General Hospital that they had not found evidence of trauma to employee's head. The evaluation of the evidence was the function of the court of appeals, and we cannot say that it was required to find relators' question the most accurate or to reject the opinion on which the finding was based. The resolution of the conflict in the opinions expressed by the medical experts was also the function of the court of appeals, and it cannot be said that a consideration of all the evidence as well as the reasonable inferences therefrom would require reasonable minds to adopt a contrary conclusion. Accordingly, the finding must be affirmed. *Grabowski v. Great Northern Oil Co.* 283 Minn. 205, 167 N.W.2d 14 (1969); *Harrison v. Schafer Const. Co.*, Minn., 244 N.W.2d 152 (1976); *Dauphine v. City of Minneapolis, Dept. of Public Welfare*, Minn., 249 N.W.2d 463 (1977).

 2. Applying the familiar tests for determining whether an employer-employee relationship existed between employee and Metro at the time of his injury, we are required to conclude that the finding that the relationship did not exist has sufficient evidentiary support. See, *Wangen v. City of Fountain*, Minn., 255 N.W.2d 813 (1977). Although Metro furnished the bulldozer which employee operated, Metro had no connection with Par-Z's project and only Par-Z controlled and supervised employee's work, paid him wages, and could have fired him for unsatisfactory work. Affirmance of the finding that an employer-employee relationship did not exist between Metro and employee on the day he bumped his head is thus required.

Employee is awarded $350 attorneys fees.

Affirmed.